**PUBLIC SERVICE INDIANA, INC.,**
Appellant (Defendant Below),

v.

**Melvin NICHOLS and Alice Nichols,**
Appellees (Plaintiffs Below).

No. 1–1283A409.

Court of Appeals of Indiana,
Fourth District.

June 26, 1986.

Rehearing Denied Aug. 25, 1986.

Kenneth A. Layton, David W. Paugh, Montgomery, Elsner & Pardieck, Seymour, for appellant.

Richard D. Schreiber, George Clyde Gray, Gray, Robinson, Eckert, Ryan & Schreiber, Indianapolis, for appellees.

YOUNG, Presiding Judge.

Public Service Indiana, Inc. appeals a jury verdict in favor of Melvin and Alice Nichols. On appeal, PSI contends that:

1) the Jackson Circuit Court improperly determined that it and not the Public Service Commission had subject matter jurisdiction over the action;

2) the doctrine of strict liability may not be applied against a utility company for injuries resulting from the sale of electricity;

3) the trial court erred in refusing to give a jury instruction based on Indiana statutes;

4) the trial court erred in giving an instruction concerning the adequacy of PSI's services;

5) the trial court erred in allowing an expert witness to express opinions based on information collected and provided by an employee;

6) the trial court erred in allowing an expert witness to express an opinion as to the reasonableness of PSI's services.

We affirm.

In 1979, the Nichols decided to go into the dairy business and borrowed money to begin the operation. They built a barn and bought and installed the necessary equipment.

During this time period, PSI was engaged in the production, sale and distribution of electrical current. It owned the electrical lines running across the Nichols property and sold the electricity utilized by the Nichols in their dairy barn. PSI was aware that the Nichols intended to use the electricity in a dairy operation and had visited the Nichols farm to discuss their electrical needs while the dairy barn was still under construction.

The Nichols finished their barn and began milking in the fall of 1979. The Nichols soon noticed that the herd was not producing milk as it should. The dairy herd developed a high level of mastitis and showed signs of nervousness. By the fall of 1980, milk production had dropped severely. The Nichols investigated various potential causes for the problem throughout this time period. In January 1981, the Nichols' feed salesman suggested they check the farm for stray voltage since the problem was continuing, and the feed analysis had indicated that the herd was receiving the proper nutrients. The Nichols had their barn tested and discovered that stray voltage was coming from PSI's neutral line. The Nichols immediately contacted PSI.

PSI verified that stray voltage was present and attempted to solve the problem by separating the primary and secondary neutral lines. PSI neglected to tell the Nichols that this procedure created significant hazards such as the potential for electrocution or fire. Upon learning of these dangers through another source, the Nichols requested that the neutrals be reconnected and the problem solved in another fashion. Despite the knowledge that the stray voltage was coming from its neutral line and that the stray voltage was damaging the Nichols dairy herd, PSI never installed the equipment that would alleviate the problem, but rather took the position that it was not obligated or permitted to do so.

By October 1981, the Nichols dairy herd was ruined and the Nichols were forced to sell the entire herd. As a result of these events, the Nichols filed bankruptcy in order to avoid a Sheriff's foreclosure sale. The Nichols brought this action against PSI seeking damages for the loss of the dairy herd and their business. The case

was tried to a jury on theories of negligence and strict liability. Punitive damages were sought but not awarded. The jury returned a general verdict for the Nichols in the amount of $343,000.00. Judgment was entered and PSI appeals on the previously listed grounds.

PSI argues that the trial court improperly determined that it had subject matter jurisdiction over this action and that the Nichols were obligated to pursue their claim through the Public Service Commission prior to seeking judicial resolution of the dispute. We disagree.

■■■ A trial court does not automatically acquire subject matter jurisdiction because it can provide a remedy that is not available through an administrative body. *Indiana Forge and Machine Co., Inc. v. Northern Indiana Public Service Co.* (1979), Ind.App., 396 N.E.2d 910, 912. The nature of the claim asserted determines the jurisdictional issue. If the legislature has provided that the administrative remedy is exclusive, the courts cannot exercise jurisdiction until the administrative remedies are exhausted. *Id.* at 912. However, this rule is not applied in a mechanical fashion. Exceptions to the rule have been created and include instances where pursuit of the administrative remedy would be futile, *United States Auto Club, Inc. v. Woodward* (1984), Ind.App., 460 N.E.2d 1255, 1258; *Northside Sanitary Landfill, Inc. v. Indiana Environmental Management Board* (1984), Ind.App., 458 N.E.2d 277, 280; *Bowen v. Sonnenburg* (1980), Ind. App., 411 N.E.2d 390, 403, where strict compliance would result in irreparable harm, *South Bend Federation of Teachers v. National Education Association— South Bend* (1979), 180 Ind.App. 299, 309, 389 N.E.2d 23, 30, or when no administrative remedy is provided. *Indiana State Highway Commission v. Zehner* (1977), 174 Ind.App. 176, 366 N.E.2d 697, 702.

In determining whether administrative remedies are available and should be exhausted, trial courts are to consider:

> The character of the question presented and the competency of the administrative

agency to answer that question; the avoidance of premature interruption of the administrative process in recognition of the interest of the agency in developing a factual record upon which to exercise its discretion and apply its expertise without the threat of litigious interference; the interest in permitting an agency to correct its own errors, a process by which unnecessary judicial proceedings are obviated; and the avoidance of deliberate or frequent flouting of established administrative processes.

*Northside Sanitary Landfill, supra* at 281 (quoting *Indiana State Department of Welfare Medicaid Division v. Stagner* (1980), Ind.App., 410 N.E.2d 1348, 1351).

■■■ The Public Service Commission was established "to insure that public utilities provide constant, reliable and efficient service to its customers, the citizens of this state." *Office of Utility Consumer Counselor v. Public Service of Indiana, Inc.* (1984), Ind.App., 463 N.E.2d 499, 503. The Commission derives its power and authority solely from statute and unless the power to act is conferred by the statute, it must be concluded that the power does not exist. *Citizens Action Coalition of Indiana, Inc. v. Northern Indiana Public Service Co.* (1985), Ind., 485 N.E.2d 610, 612. The Commission can exercise only administrative or legislative powers. *Citizens Action Coalition of Indiana, Inc. v. Public Service Commission of Indiana* (1981), Ind. App., 425 N.E.2d 178. It has no judicial powers and cannot award money judgments. *Indiana Telephone Corp. v. Indiana Bell Telephone Co., Inc.* (1976), 171 Ind.App. 616, 358 N.E.2d 218, 224 modified by 360 N.E.2d 610; *State ex rel Indianapolis Water Co. v. Niblack* (1959), 240 Ind. 32, 161 N.E.2d 377, 378. Any order the Commission makes with regard to services or rates must be prospective in nature and cannot grant compensation for events that occurred in the past. *Id.* A reading of the applicable code sections supports this interpretation.

The mechanism by which citizens may seek correction of insufficient service or

unreasonable rates is provided by IND. CODE 8-1-2-54 which states:

> Upon a complaint made against any public utility by any mercantile, agricultural or manufacturing society or by any body politic or municipal organization or by ten (10) persons, firms, corporations or associations, or ten (10) complainants of all or any of the aforementioned classes, or by any public utility, that any of the rates, tolls, charges or schedules or any joint rate or rates in which such petitioner is directly interested are in any respect unreasonable or unjustly discriminatory, or that any regulation, measurement, practice or act whatsoever affecting or relating to the service of any public utility, or any service in connection therewith, is in any respect unreasonable, unsafe, insufficient or unjustly discriminatory, or that any service is inadequate or can not be obtained, the commission shall proceed, with or without notice, to make such investigation as it may deem necessary or convenient. But no order affecting said rates, tolls, charges, schedules, regulations, measurements, practice or act, complained of, shall be entered by the commission without a formal public hearing.

This statute makes no provision for an award of damages for harm caused by inadequate service. Similarly, IND. CODE 8-1-2-69 provides the Commission a mechanism to assure that future services are provided but provides no remedy for past harm.

■ In the present case, the Nichols brought their action against PSI alleging that PSI had breached its duty to provide reasonable and adequate services by permitting stray voltage to flow from PSI lines to the ground and onto the Nichols' dairy farm. The Nichols claimed that as a result of this breach, their dairy herd became seriously ill and diseased, causing severe and permanent damage to the Nichols' dairy business. PSI filed a motion to dismiss based on lack of subject matter jurisdiction, asserting that the Nichols' claims were based on contentions that PSI's services were unsafe and therefore the claims were within the jurisdiction of the Commission and not the courts. PSI also argued that the equipment necessary to solve the stray voltage problem was not standard and that under IND. CODE 8-1-2-54 only the Commission could determine whether PSI was obligated to provide the necessary equipment. However, the issues presented by the Nichols' claim only remotely deal with questions of adequate service as contemplated by IND. CODE 8-1-2-54. There was no question that service was provided, it was at an adequate level and quantity and the rates were appropriate. The focus of the claim is PSI's failure to warn the Nichols of the potential for a stray voltage problem, the failure to correct the stray voltage problem once PSI was aware of it, the negligence of PSI in permitting the escape of the stray voltage, and PSI's placement of an unsafe product into the stream of commerce. The resolution of these issues does not involve agency policy and does not concern the adequacy of the service provided or rates charged to the general public. The issues involve traditional concepts of negligence and strict liability law "which only tangentially address the reasonableness, adequacy and sufficiency of the electric service being provided by the electric company." *Schriner v. Pennsylvania Power & Light Co.,* (1985), 348 Pa.Super. 177, 501 A.2d 1128, 1130. Questions of adequacy of service are involved only as explanations of why the stray electricity existed, how the harm was caused, and whether PSI knew of the danger but failed to warn about it. These same issues arise in all other product liability actions based on negligent failure to warn and strict liability. This case is no different from a case in which a manufacturer sells a product without warnings or guarding devices. The ultimate question in either event is whether the product was defective and whether that defect caused harm to the user. These issues are precisely the type reserved for judicial resolution.

Even if the Nichols had taken their complaint to the Commission, the Commission lacked the authority to award the damages

sought. Waneta Wampler, the Director of Consumer Affairs and Appeals for the Public Service Commission, testified that the Nichols contacted her concerning the stray voltage problem after this litigation began. She stated that the Commission could not do anything for the Nichols because they lacked the "technical people" to resolve that type of problem, they depended on the utility to help the customer, the customer had electric service, the service had been adequate and the problem was with stray voltage which was an entirely new area to the Commission. In addition, Wampler testified that the Nichols were asking for damages and the Commission could not award damages so it would have been a waste of the Commission's time for the Nichols to pursue their claim through the Commission.

As indicated by Wampler's testimony, it would have been wasteful and futile for the Nichols to seek damages for their injuries by filing their complaint with the Commission because the agency had no authority to grant the relief sought. Under the circumstances presented, the trial court properly determined that it had subject matter jurisdiction of this action and denied PSI's motion to dismiss.

■■■ PSI next argues that reversal is required because the trial court denied its motion for judgment on the evidence. PSI's motion was based on the premises that the theory of strict liability was not applicable to this case because a product was not involved and because the trial court lacked subject matter jurisdiction. As previously discussed, the trial court had subject matter jurisdiction, therefore we address only the second aspect of this argument.[1]

■■■ PSI properly notes that strict liability requires that a party be injured by a product that has been introduced into the

stream of commerce. *See* IND. CODE 33–1–1.5–3. However, PSI asserts that because its power lines are not products, the theory of strict liability is inapplicable in this case. This argument misses the mark.

■■■ Indiana recognizes that electricity is a product which can be sold. The crucial question is whether the product has been placed into the stream of commerce prior to the injury causing accident. Electricity is considered to be placed into the stream of commerce when it reaches its destination in a home or factory. *Petroski v. Northern Indiana Public Service Co.* (1976), 171 Ind.App. 14, 354 N.E.2d 736, 747. The electricity must be in a marketable and marketed state at the time it causes the injury to be treated as a product under strict liability, meaning that it has been reduced from a transmission voltage to a consumption voltage. *Hedges v. Public Service Company of Indiana, Inc.* (1979), Ind.App., 396 N.E.2d 933, 935.

In the present case, the stray electricity had been reduced to consumption level and passed through customer meters. Therefore it had been introduced into the stream of commerce at the time the Nichols' cattle came in contact with it. The source of the stray electricity was the neutral line owned by PSI and PSI was aware that the stray electricity was injuring the Nichols' dairy cattle.

■■■ PSI presents the argument that the neutral line itself was the cause of the injury and that strict liability does not apply because utility lines are not a product. The Nichols argue that the lines are products which have been introduced into the stream of commerce because PSI exacts an amount from each customer to cover or recapture the cost of electrical lines. We reject the Nichols argument and find that the electric company's transmission and distribution lines are not a part of the end

---

1. The Nichols argue that PSI waived this issue by relying on the new rather than old version of the products liability statute when raising the argument at the trial level. However, the thrust of PSI's argument under either statute and the common law is that no product was involved

which would make PSI liable under a theory of strict liability. PSI's position remained the same in its Motion to Correct Errors and appellate brief. The only change was in the authority relied on to support the position. As a result, there has been no waiver.

product. *Petroski v. Northern Indiana Public Service Co., supra* 354 N.E.2d at 747. The lines are not "rented" to customers in the legal sense of the word. Rental usually involves physical possession or limited control over the item for a period of time. *See* Black's Law Dictionary, 5th Ed. (1979). The lines, in this case, are a means of distributing a product and remain in the ownership and exclusive control of PSI. This fact, however, does not alter PSI's duty to supply safe electricity. If the end product is unsafe and results in injury, we will not deny the injured party's right to seek recovery under a theory of strict liability merely because the product is delivered through lines that are not a part of the end product.

▇ In this case, there is no contention that the cattle came in direct contact with the power lines. Rather, the cattle were injured by stray voltage or the end product, electricity. The lines were involved only as the means of distributing the product which ultimately escaped and caused the harm. Because the electricity was a product, the court did not err in permitting the Nichols to pursue the strict product liability theory.

▇ PSI alleges that the trial court erred in refusing to give PSI's Tendered Instruction No. 4 which stated:

At all times relevant to this case, there was in full force and effect in the State of Indiana, the following statutes:

No public utility, or agent or officer thereof, or officer of any municipality constituting a public utility, as defined in this chapter, may charge, demand, collect, or receive from any person a greater or less compensation for any service rendered or to be rendered, or for any service in connection therewith, than that prescribed in the published schedules or tariffs then in force or established as provided herein, or than it charges, demands, collects, or receives from any other person for a like and contemporaneous service.

I.C. 8–1–2–103.

No public utility may make or give an undue or unreasonable preference or advantage to any person, or subject any person to any undue or unreasonable prejudice or disadvantage in any respect.

I.C. 8–1–2–105.

All regulations, practices, installations and services prescribed, approved or required by the commission shall be in force and shall be prima facie reasonable unless finally found otherwise by the Court of Appeals or by the Supreme Court if the cause is transferred to and decided by that court.

I.C. 8–1–3–6.

Further, there was in full force and effect the following Public Service Commission regulations:

Modification at Customer's Expense. If a customer requests for his convenience or by his actions requires that utility facilities be redesigned, reengineered, relocated, removed, modified or reinstalled, the utility may require the customer to make payment to it the full costs of performing such service.

You are further instructed that at all times relevant to this case there was in force and effect a published tariff approved by the Public Service Commission of Indiana regulating the rates, and terms and conditions for the sale of electricity by the Defendant, Public Service Company of Indiana, Inc. This tariff has the force and effect of law, and an electric utility company may not provide a service, or charge a rate to one customer which it does not provide or charge to all customers similarly situated within the same rate classification. The Defendant, Public Service Company of Indiana, Inc. is not required, or permitted to favor one customer at the expense of all other customers in the same rate class.

A utility company is permitted to limit its liability to its customers if such limitations are a part of the utility's tariff, and are approved by the Public Service Commission of Indiana. If the utility compa-

ny's liability has been limited in this fashion, it would be an illegal act for the utility company to depart from its tariff by assuming a greater liability to one of its customers beyond the limitation already contained in the utility's tariff.

The trial court properly refused the instruction because it consists of a string of "general and abstract statutory language" without any explanation of the statutes applicability to the facts of the case. *Ernst v. Sparacino* (1978), 177 Ind.App. 610, 380 N.E.2d 1271, 1276, abrogated in part and on different issue by *Sims v. Huntington* (1979), 271 Ind. 368, 393 N.E.2d 135; *Cato Enterprises, Inc. v. Fine* (1971), 149 Ind.App. 163, 271 N.E.2d 146, 156; *Summers v. Weyer* (1967), 141 Ind. App. 176, 226 N.E.2d 904, 907. The "[m]is-application of statutes is an unavoidable hazard for lawyers and courts alike. It is a hazard that should not be introduced into a jury trial by instructions." *Ernst v. Sparacino, supra* 380 N.E.2d at 1276. "[T]he practice of giving instructions which state mere abstract propositions of law without specific application is of little value to a jury and is not to be approved...." (emphasis omitted) *Cato Enterprises, Inc. v. Fine, supra* 271 N.E.2d at 156.

▪ In addition to being an abstract statement of law, the refused instruction was misleading and confusing. The instruction suggests that PSI's tariffs did not permit PSI to correct the stray voltage problem and therefore PSI was not liable for the harm caused to the Nichols. However, the evidence presented at trial clearly indicated that the tariff did not protect or shelter PSI from liability for damages caused by an "interruption or variation in service" if the problem was caused by the negligence of PSI. A trial court may properly refuse misleading and confusing instructions tendered by a party. *Foster v. United Home Improvement Company, Inc.* (1981), Ind.App., 428 N.E.2d 1351, 1359.

PSI also asserts that the trial court erred in giving the Nichols' Instruction No. 9 on the basis that the trial court lacked subject matter jurisdiction of this case. As previously discussed, the trial court had subject matter jurisdiction of the case and therefore there was no error in the giving of the Nichols' tendered instruction.

PSI next contends that the trial court erred in allowing an expert witness to express opinions based on his review of information collected and provided to him by his son-employee. The Nichols' expert, Hoysler, owns a business engaged in managing farms and conducting economic evaluations and appraisal work. His son, Steve, is one of fifteen employees and is trained in the areas of farm management and farm appraisal. He was also formerly a dairyman. Steve came to Indiana for three days and gathered information for Hoysler's use. Steve's work included an inspection of the Nichols' dairy farm and interviews with individuals from the surrounding area and Purdue University. In addition to this information, Hoysler utilized herd health records, bills and statements, depositions, other cost information, numerous publications, and his own expertise to develop his opinions. Hoysler testified that the information provided by Steve was relied on as "background information that was helpful but not basic to the preparation of [his] report" and was the type of information normally relied on by experts in his field of business. However, the information did serve as the basis of Hoysler's opinion on the "kind and quality of facilities" used by the Nichols.

During the course of direct examination Hoysler was asked his opinion "as to the reasonableness [of] the Nichols building their own dairy barn and buying used dairy equipment." PSI objected to the extent that any opinion expressed by Hoysler relied on information supplied by Steve or any other individual that would not be called as a witness because the information constituted hearsay and was unreliable because Hoysler had not personally visited the Nichols' farm.

▪ An expert's opinion that is based in part on hearsay is not excludable if:

1) the expert has sufficient expertise to evaluate the reliability and accuracy of the hearsay;

2) the hearsay is of a type normally found reliable;

3) the hearsay is of a type customarily relied upon by the expert in the practice of his profession or expertise.

*Duncan v. George Moser Leather Co.* (1980), Ind.App., 408 N.E.2d 1332, 1343. *See also Clouse v. Fielder* (1982), Ind.App., 431 N.E.2d 148, 155. Consultations with other individuals is included within the ambit of this rule. Reliance on hearsay information does not destroy the witness' expert status but goes only to the weight of the testimony when considered by the trier of fact. *Bixler v. State* (1984), Ind., 471 N.E.2d 1093, 1099–1100.

In the present case, it is unquestionable that Hoysler had the expertise to evaluate the reliability and accuracy of the hearsay information on which he relied. The information consisted of photographs, documents, reports and other information of a type that is normally utilized by individuals in Hoysler's profession to evaluate and appraise farm situations and is considered reliable. Therefore, the trial court properly permitted Hoysler to testify as to his opinions which were in part based on hearsay. The trier of fact was aware that Hoysler was relying in part on this information and could adequately determine the weight to be given to his testimony.

PSI's final argument is that the trial court erred in permitting Klingler, an expert witness, to give his opinion as to "whether Public Service Indiana used reasonable care in supplying electrical service facilities to the Nichols." PSI objected, contending that the testimony went to the ultimate issue in the case and invaded the province of the jury.

Expert witnesses may give an opinion as to the ultimate fact in issue. "The decision to allow the opinion is left to the discretion of the trial judge and is reviewable only for an abuse of discretion." *Hill v. State* (1984), Ind., 470 N.E.2d 1332, 1337. If the testimony is in an area in which the jurors are as well-qualified as the expert to form an opinion, the testimony should not be permitted. *Id.*

In this case, Klingler testified that the Nichols could not have known what was occurring on their farm because of the complicated nature of the problem. He related the minimum steps that PSI should have taken and that the nature of the problem required a specialist to understand it and deal with it. The trial transcript clearly illustrates that the problem of stray voltage is a complex area of electricity requiring special knowledge to understand both the causes of and solutions for the problem. The technology involved was not within the ordinary knowledge of the average juror. The expertise of Klingler was necessary to assist the jury in determining the nature of the problem involved and the adequacy of the steps taken by PSI. Therefore, we find there was no error in permitting Klingler to give his opinion on this topic.

Finding no error, we affirm the trial court in all respects.

MILLER and CONOVER, JJ., concur.