**Dale ZumBERGE, et al., individually & d/b/a ZumBerge Holsteins, Respondents,**

v.

**NORTHERN STATES POWER COMPANY, Appellant.**

**No. CX–91–907.**

Court of Appeals of Minnesota.

Feb. 18, 1992.

Review Denied April 29, 1992.

James H. Kaster, Jeffrey P. Anderson, Nichols, Kaster & Anderson, Minneapolis, for respondents.

Michael T. Nilan, Brian N. Johnson, John M. Baker, Popham, Haik, Schnobrich & Kaufman, Ltd., Minneapolis, for appellant.

Considered and decided by AMUNDSON, P.J., and FORSBERG and KALITOWSKI, JJ.

## OPINION

AMUNDSON, Judge.

Respondents brought this action against appellant Northern States Power Company (NSP) for damages resulting from stray voltage which injured their dairy herd. Following a jury trial, NSP was found negligent and respondents were awarded $1,000,000 in damages. NSP's motions for judgment notwithstanding the verdict or a new trial were denied, judgment was entered and this appeal followed. We affirm.

## FACTS

Dale, Gloria and Steven ZumBerge operate a family dairy farm near Green Isle, Minnesota. As of 1975, there were over 30,000 dairy farms in the state of Minnesota. The Minnesota Dairy Herd Improvement Association rated the ZumBerges' herd one of the top 100 herds in the state, with average annual milk production above the state and national averages.

In 1977, the ZumBerges noticed behavioral problems with the herd. The cows were reluctant to eat, failed to conceive, exhibited nervousness in the milk barn, developed leg and hoof problems, and showed high levels of mastitis (an udder infection resulting in high bacterial counts which makes milk unacceptable for sale). By 1983, the herd's milk production fell below the Minnesota Dairy Herd Improvement Association statewide average.

In 1984, the ZumBerges learned through a dairy industry magazine that stray voltage may have detrimental effects on dairy cattle. The farm was tested for stray voltage; the results showed 2.5 volts, a fairly high reading, in the dairy barn. NSP was contacted. The NSP crew confirmed stray voltage was present in the barn and determined NSP's neutral line was the source of the stray voltage.

In August 1984, NSP installed a "neutral isolator" to prevent neutral current on NSP's line from being transferred to the farm's neutral line and then onto farm property. The isolator supposedly eliminated the problem. Three months later, however, another NSP crew replaced an allegedly undersized transformer, and in the process, improperly reinstalled the neutral isolator. The isolator remained dysfunctional until February 1990.

The ZumBerges sued NSP in 1986, alleging negligence, breach of warranty and strict liability. After the jury verdict for the ZumBerges, NSP moved for judgment notwithstanding the verdict or a new trial arguing (1) its rate tariff precluded recovery of consequential damages; (2) *Hapka v. Paquin Farms*, 458 N.W.2d 683 (Minn. 1990), prevents the ZumBerges' recovery for economic losses; (3) the trial court

erred in its evidentiary rulings; and (4) the trial court erroneously submitted to the jury a calculation which represented pre-verdict interest. This appeal followed.

### ISSUES

1. Did the trial court err in concluding that the rate tariff does not insulate NSP from liability?

2. Did the trial court err in concluding *Hapka* did not preclude respondents' recovery of economic losses?

3. Did the trial court err in allowing respondents' damage expert to testify?

4. Did the trial court abuse its discretion in any of its challenged evidentiary rulings, and if so, was NSP prejudiced by those rulings?

5. Did the trial court err in permitting the jury to consider evidence of "additional interest" as part of the respondents' damages and, if so, was NSP prejudiced by its admission?

6. Did the trial court err in denying NSP's motion for judgment notwithstanding the verdict or a new trial?

### ANALYSIS

#### I

■ The limitation of liability provision in NSP's rate tariff states:

> 1.4 Continuity of Service. The Company will endeavor to provide continuous service but does not guarantee an uninterrupted or undisturbed supply of electric service. The Company will not be responsible for any loss or damage resulting from the interruption or disturbance of service for any cause other than gross negligence of the Company. *The Company will not be liable for any loss of profits or other consequential damages resulting from the use of service* or

any interruption or disturbance of service.

(Emphasis added.) Interpretation of the tariff's language and application to this case is a question of law subject to independent review on appeal. *See Meyering v. Wessels*, 383 N.W.2d 670, 672 (Minn.1986); *Hibbing Educ. Ass'n. v. Public Employment Relations Bd.*, 369 N.W.2d 527, 529 (Minn.1985).

■ NSP argues the stray voltage arose from the ZumBerges' "use" of electrical service, and therefore recovery of consequential damages is improper. The trial court concluded the "mere availability of continuous electric energy" to the ZumBerges did not amount to "use" under the tariff. We agree with the trial court.

This court has recognized the rate tariff as a valid limitation of liability and not contrary to public policy. *Computer Tool & Eng'g, Inc. v. Northern States Power Co.*, 453 N.W.2d 569, 573 (Minn.App.1990), *pet. for rev. denied* (Minn. May 23, 1990). In *Computer Tool*, telephone company employees cut through a primary electrical service line. The incident resulted in a power surge which seriously damaged Computer Tool's equipment. This court concluded the tariff immunized NSP from liability because damage caused by an interruption or disturbance of service was expressly limited by the tariff.

> By its own terms, the tariff does not purport to relieve NSP from all negligence under all conceivable circumstances. The tariff is narrow and applies to exonerate NSP from liability occasioned by interruptions or disturbances in the electric service. Liability would remain for all injury not caused by an interruption or disturbance in power.

*Id.*[1]

NSP's interpretation of the tariff language requires a broad reading, namely, the ZumBerges' mere use of electrical ser-

---

**1.** In *Computer Tool & Eng'g, Inc. v. Northern States Power Co.*, No. C9–89–1027, 1990 WL 39963 (Minn.App. Apr. 10, 1990) (*Computer Tool II*), this court stated: "By its express language, the limitation of liability provision here applies to all claims resulting from the use, interruption, or disturbance of service." NSP argues

this language means the tariff limits liability for all claims resulting from use of NSP's service. However, the court in *Computer Tool II* dealt with a fact situation involving interruption of service and did not interpret or apply the "use" phrase.

vice "resulted" in the presence of stray voltage which ultimately caused the damage. Such a broad reading, however, is inconsistent with this court's conclusion that the language should be read narrowly:

> The tariff is narrow and applies to exonerate NSP from liability occasioned by interruptions or disturbances in the electric service * * *. Narrowly construed, the limitation applies where an occurrence breaks the uniformity and continuity of electric service, which is exactly what happened here.

*Id.* Hence, construing the phrase "use of service" as precluding liability in all instances where damage arose from "the mere availability of continuous electrical energy" contravenes public policy. Nonetheless, even if we construe the statute broadly, the evidence supports the conclusion that the ZumBerges' use of service did not cause the stray voltage.

There was evidence at trial that the "cause" of the stray voltage was potentially attributable to several factors, including an inadequately sized transformer, use of split-bolt connectors, and failure to properly install or maintain the neutral isolator on the part of NSP. Thus, while "neutral-to-earth" voltage may be a natural phenomena associated with power distribution systems (and therefore "caused" by the mere use of electricity), "stray voltage" is not the same thing. Rather, neutral-to-earth voltage is only correctly termed "stray voltage" when it appears in an animal environment "at a magnitude that is problematic to the animals."

NSP's assertion that the two are synonymous contradicts the company's concession that stray voltage is a controllable phenomena. Consequently, equating unavoidable, but relatively innocuous, neutral-to-earth voltage with stray voltage in the dairy barn is like equating a tiger loose on the street to one properly caged and controlled. We therefore find that the stray voltage was not caused by the ZumBerges' "use of service" as that phrase is used in the rate tariff, and that the tariff, interpreted narrowly, does not bar recovery in this matter.

## II

■ NSP argues that based on *Hapka v. Paquin Farms*, 458 N.W.2d 683 (Minn. 1990), the ZumBerges are not entitled to recovery on a negligence theory. The trial court determined *Hapka* did not preclude recovery for two reasons: (1) the ZumBerges' damages arose from a "consumer" transaction since they did not have equal bargaining power with NSP, and (2) the stray voltage was not the product of any transaction between NSP and the ZumBerges. We agree.

The Minnesota Supreme Court held in *Superwood Corp. v. Siempelkamp Corp.*, 311 N.W.2d 159, 162 (Minn.1981), that economic losses arising out of commercial transactions are not recoverable under negligence and strict products liability theories, unless they involve personal injury or damage to "other property." In *Hapka*, the supreme court further restricted the availability of tort recovery by eliminating the "other property" exception. *Hapka*, 458 N.W.2d at 688.[2] Consequently, whether the ZumBerges may recover under *Hapka* hinges on whether the damages were "economic losses" arising from a "commercial transaction." *Id.*

■ A "commercial transaction" is generally defined as a transaction governed by Article 2 of the Uniform Commercial Code. *McCarthy Well Co. v. St. Peter Creamery*, 410 N.W.2d 312, 314 (Minn.1987). The trial court ruled that the provision of electricity was a sale of goods under Article 2. However, the decision to treat electricity as subject to Article 2 is a legal question as yet unsettled in Minnesota. Other jurisdictions which have considered the issue, pri-

---

**2.** We note that recent actions of the legislature cast doubt on the continuing validity of *Hapka*. Minn.Stat. § 604.10 now provides:

> Economic loss that arises from a sale of goods that is due to damage to tangible property other than the goods sold may be recovered in tort as well as in contract, but economic loss that arises from a sale of goods between parties who are each merchants in goods of the kind is not recoverable in tort.

1991 Minn.Laws ch. 352, § 2.

marily in the context of strict liability, are not in agreement. *See, e.g., Otte v. Dayton Power & Light Co.,* 37 Ohio St.3d 33, 523 N.E.2d 835, 838–39 (1988); *Smith v. Home Light & Power Co.,* 734 P.2d 1051, 1055 (Colo.1987); *Public Service Ind., Inc. v. Nichols,* 494 N.E.2d 349, 355 (Ind.App. 1986). Nonetheless, the trial court's conclusion that NSP's sale of electricity is controlled by Article 2 was not dispositive of its conclusion that the ZumBerges could recover their losses.

The court in *Hapka* distinguished commercial from consumer transactions based on the relative sophistication and bargaining power of the parties. *Hapka,* 458 N.W.2d at 688. It reasoned that consumers who lacked the ability to negotiate warranties and remedies should still have the full "panoply of liability theory" available. *Id.* NSP argues that, unlike ordinary consumers, the ZumBerges and others who receive electricity are represented by the Minnesota Department of Public Service, a public advocate, in negotiations with NSP, and that any contractual limitations favoring NSP require Minnesota Public Utilities Commission approval. We do not believe this relationship is relevant to this issue. Given the supreme court's concern that UCC remedies were inadequate where a consumer lacked bargaining power, we find that any "transaction" between NSP and the ZumBerges should not fall within the "commercial transaction" definition as used in *Hapka* so as to preclude their recovery on tort theories.

Equally important, stray voltage was not the product of any transaction between the ZumBerges and NSP. "Economic loss" is defined as loss

> resulting from the failure of the product to perform to the level expected by the buyer and commonly has been measured by the cost of repairing or replacing the product and the consequent loss of profits, or by the diminution in value of the product because it does not work for the general purposes for which it was manufactured and sold.

*Minneapolis Soc'y of Fine Arts v. Parker–Klein Assocs. Architects,* 354 N.W.2d 816,

820–21 (Minn.1984), *overruled on other grounds, Hapka,* 458 N.W.2d at 688; *see also TCF Bank & Sav., F.A. v. Marshall Truss Sys., Inc.,* 466 N.W.2d 49, 53 (Minn. App.1991), *pet. for rev. denied* (Minn. Apr. 29, 1991).

While neither party specifically addressed this facet of *Hapka/Superwood,* we conclude the ZumBerges' losses do not fit into the definition of economic loss. There was no indication that the electricity provided by NSP failed to perform adequately or for the purposes for which it was sold. Rather, the evidence suggests the ZumBerges' damages resulted from NSP's failure to control or failure to warn the ZumBerges of injurious stray voltage. Accordingly, regardless of the type of transaction involved, the damages suffered did not "arise" from that transaction, but from actions outside and independent of the transaction. Under these circumstances, the ZumBerges may recover because their losses arose from NSP's negligence and not from any transaction between NSP and the ZumBerges.

### III

NSP contends the testimony of the ZumBerges' damage expert lacked sufficient foundation. The trial court has broad discretion in determining whether sufficient foundation has been laid for an expert to state an opinion. *Benson v. Northern Gopher Enters.,* 455 N.W.2d 444, 446 (Minn. 1990). The trial court's decision will not be reversed absent clear abuse of discretion. *Id.*

NSP focuses on Dr. Behr's methods for calculating the ZumBerges' losses and the information on which he based his opinions. The trial court found that Dr. Behr was a qualified economist, and while his methodology was apparently unique, no evidence indicates it was invalid. Dr. Behr explained in great detail on direct and cross-examination how he reached his conclusions and why he made the assumptions he did. Consequently, the jury was given ample opportunity to evaluate the credibility and basis of his opinions. It is "firmly within the province of the jury as trier of

fact to weigh and evaluate * * * expert opinions." *Uselman v. Uselman,* 464 N.W.2d 130, 138 (Minn.1990). Here, while Dr. Behr's calculations may have been unusual or unique, the trial court did not abuse its discretion in permitting his testimony.

## IV

■ The trial court has broad discretion in admitting or excluding evidence. Its ruling will not be disturbed unless it is based on an erroneous view of the law or constitutes an abuse of discretion. *Id.* (citing *Reinhardt v. Colton,* 337 N.W.2d 88, 93 (Minn.1983)). Even if the trial court erred in its ruling, NSP is not entitled to a new trial absent a showing of prejudice. *See id.*

■ NSP challenges the conduct of the ZumBerges' counsel and a series of rulings by the trial court which NSP claims confused the jury and resulted in prejudice. Specifically, NSP alleges error in the following:

  1) Admission of evidence concerning an alleged ex parte communication between the ZumBerges' former counsel, Thomas McCarthy, and NSP's expert witness during an on-farm inspection in 1987;

  2) Admission of evidence regarding a letter from McCarthy to the ZumBerges' stray voltage expert concerning the above conversation; and

  3) Trial counsel's implication that NSP and/or its counsel should have told the ZumBerges that the tests conducted in 1987 revealed a continuing problem with stray voltage.

Prior to trial, the parties entered into a stipulation whereby the ZumBerges agreed not to call McCarthy, and NSP stipulated to the authenticity of the letter from McCarthy to the ZumBerges' stray voltage expert. NSP argues that reference to the letter was improper and prejudicial in that it implied that NSP's expert gave the ZumBerges' counsel assurance that the neutral isolator was functioning, while failing to advise the Zumberges that stray voltage was still present.

The trial court gave curative instructions during testimony and during final instructions, indicating that NSP's counsel could not speak directly to the ZumBerges due to ethical constraints. The jury was further instructed that NSP was not relieved of any duty on its part to advise the ZumBerges of existing stray voltage after the 1987 on-farm visit.

None of the challenged events resulted in prejudice. It was to NSP's advantage, presumably, that McCarthy not testify at trial. In addition, there was no clear evidence that any conversation between McCarthy and NSP's expert was an improper ex parte communication. Further, counsel for NSP was given a full opportunity to present its theory of the case and to clear up any potential misunderstandings through cross-examination and final argument. Considering these circumstances, the trial court's rulings did not constitute an abuse of discretion, nor was NSP prejudiced by these events.

## V

NSP argues that the trial court improperly allowed the jury to consider prejudgment interest as an element of damages. Prejudgment interest is computed according to Minn.Stat. § 549.09 (1990). Both parties agree that the statute requires prejudgment interest to be awarded by the court at a rate of seven percent. The ZumBerges assert that Dr. Behr's calculations were not prejudgment interest, but additional interest accruing on outstanding business accounts due to their yearly losses.

■ Generally, interest is not allowed as part of the damages in a claim for unliquidated damages because the party liable cannot establish the amount of the liability in advance. *See Oliver–Elec. Mfg. Co. v. I.O. Teigen Constr. Co.,* 183 F.Supp. 768, 769 (D.Minn.1960). Nonetheless, an injured party may, in some circumstances, recover additional interest accruing on outstanding accounts. *See Anderson v. Lloyd's Feed Serv.,* 443 N.W.2d 208, 210–11 (Minn.App.1989). Dale Zumberge testi-

fied that, had the losses from stray voltage not occurred in each year, the additional funds would have been used to reduce his debt load. The difficulty arose in part from the fact that the ZumBerges' actual debt (at least from 1982 to 1990) is unknown because NSP successfully moved to prohibit the testimony of the ZumBerges' bankruptcy trustee, and any mention that the ZumBerges were in bankruptcy.

NSP argues, and the ZumBerges' expert concedes, that the amount of additional interest is equivalent to a calculation of the time value of the losses, i.e., what the ZumBerges would have accrued in interest if they would have put the loss amount in the bank each year earning 10% interest. As such, the additional interest may be interpreted as prejudgment interest, in which case admission of the evidence was erroneous. However, in order to obtain a new trial, NSP must also show that the error was prejudicial. *Uselman*, 464 N.W.2d at 138.

Even if the trial court erred in allowing the jury to consider the additional interest evidence, there is no indication that the jury relied on that evidence. *See Mervin v. Magney Constr. Co.*, 399 N.W.2d 579, 584 (Minn.App.1987) (amount of damages sustained by tort plaintiff is a fact question for the jury); *Nemanic v. Gopher Heating & Sheet Metal, Inc.*, 337 N.W.2d 667, 670 (jury not bound to accept expert's opinion). Furthermore, NSP cannot show clear prejudice since the verdict amount was supported by competent evidence even without the additional interest figure.

## VI

Judgment notwithstanding the verdict is inappropriate so long as there is any competent evidence reasonably tending to support the verdict. *Thorn v. Glass Depot*, 373 N.W.2d 799, 802 (Minn.App. 1985), *pet. for rev. denied* (Minn. Nov. 1, 1985). Evidence must be viewed in the light most favorable to the verdict. *Anderson*, 443 N.W.2d at 209. The ZumBerges presented considerable evidence supporting their theory that NSP was aware of stray voltage and its potentially

negative effects on dairy cattle as early as 1978 or 1980. Further, the evidence was undisputed that NSP failed to properly reinstall the neutral isolator in 1984 and did not rectify the problem until 1990. Moreover, the evidence supported the conclusion the ZumBerges had suffered financial losses as a result of decreased milk production caused by the stray voltage. Accordingly, the trial court did not err in denying judgment notwithstanding the verdict.

On appeal from a denial of a motion for a new trial, the verdict must stand unless it is manifestly and palpably contrary to the evidence, viewed in a light most favorable to the verdict. *Mervin*, 399 N.W.2d at 584. For the same reasons cited above, the trial court did not err in denying NSP's motion for a new trial, since the verdict was not manifestly or palpably contrary to the evidence.

## DECISION

The ZumBerges were not barred from recovering their losses under NSP's rate tariff or Minnesota case law. The trial court did not abuse its discretion in allowing the ZumBerges' damage expert to testify, or in allowing evidence of a letter from the ZumBerges' former counsel to their expert. Although the trial court may have erred in allowing the jury to consider an "additional interest" damage component, NSP was not prejudiced by its admission. The trial court properly denied NSP's motions for judgment notwithstanding the verdict and a new trial.

Affirmed.