OTTE ET AL., APPELLEES, *v.* DAYTON POWER & LIGHT COMPANY, APPELLANT.

[Cite as Otte *v.* Dayton Power & Light Co. (1988), 37 Ohio St. 3d 33.]

(No. 87-1098—Submitted March 2, 1988—Decided May 25, 1988.)

34

*Teaford, Rich, Belskis, Coffman &*
*Wheeler, Jeffrey A. Rich, James R.*
*Gorry, Jr., Huffman, Landis & Weaks*
*Co., L.P.A.,* and *Robert J. Huffman,*
for appellees.
  *Freund, Freeze & Arnold, Neil F.*

*Freund* and *John G. Witherspoon, Jr.,* for appellant.

*Porter, Wright, Morris & Arthur, John M. Adams, Joseph W. Ryan, Jr.,* and *James D. Curphey,* urging reversal for *amicus curiae,* Ohio Electrical Utilities Institute.

*Robert J. DeLambo* and *Glen Wagner,* urging affirmance for *amicus curiae,* Ohio Farm Bureau Federation and Milk Marketing, Inc.

WRIGHT, J. In the case at bar, the jury returned a verdict finding DP&L negligently failed to warn the Ottes of the effects of stray voltage. DP&L was adjudged to be at fault to the extent of fifty-one percent of the damages. This verdict was overturned by the appellate court on the theory that because strict liability was available as a cause of action, a new trial was necessary. For the reasons articulated below, we hold strict liability[1] is inapplicable under the facts of this case. Since it is not available as a cause of action against DP&L and the trial court committed no prejudicial error in the negligence action, the jury verdict must be reinstated.

Our rejection of the doctrine of strict liability as a cause of action against a highly regulated public utility is based on three alternate rationales: (1) electricity is not a product within the meaning of Section 402A of the Restatement of the Law 2d, Torts; (2) *stare decisis* in Ohio suggests rejection of strict liability under the facts of this case; and (3) the public policy reasons justifying strict liability are not viable with respect to a highly regulated utility.

I

Section 402A of the Restatement of the Law 2d, Torts (1965) 347-348, provides, in pertinent part:

"Special Liability of Seller of Product for Physical Harm to User or Consumer.

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property * * *."

Ohio formally adopted this proposition of law in *Temple* v. *Wean United, Inc.* (1977), 50 Ohio St. 2d 317, 4 O.O. 3d 466, 364 N.E. 2d 267.

Section 402A obviously applies only to the sale of a product in a defective condition. It does not apply to a service. We now reach the perplexing question of whether electricity is a product within the context of the facts before us.

A "product" is anything made by human industry or art. Electricity appears to fall outside this definition. This is so because electricity is the flow of electrically charged particles along a conductor. DP&L does not manufacture electrically charged particles, but rather, sets in motion the necessary elements that allow the flow of electricity. What we have here is a purported defect in the distribution system. Such a system is, in our view, a service.

Appellees and the court of appeals have attempted to equate the process of creating and delivering electricity to the manufacturing and sale of an ordinary consumer product. Such an enterprise is an intellectual disaster. This is true since neutral-to-earth voltage, the purported "product" in this case, has no benefit to the con-

---

[1] This opinion does not address the applicability of strict liability for ultrahazardous activities. This tort is, of course, distinguishable from an action for products liability.

sumer, is clearly not the subject of a "sale" to a consumer, and is indisputably not "defective." Neutral-to-earth voltage is neither marketed nor marketable. The neutral-to-earth voltage in this case was approximately three volts while standard voltage is 120 to 140 volts. The stray voltage involved here is nothing more than the byproduct of the tranmission of electrical power and did not escape until *after* it passed through the Ottes' meter. As stated in *Kohli* v. *Pub. Util. Comm.* (1985), 18 Ohio St. 3d 12, 13, 18 OBR 10, 479 N.E. 2d 840, 841, "[stray voltage] is a normal and natural condition which is common to every power distribution system in this country."

Consumers, moreover, do not pay for individual electrically charged particles. Rather, they pay for each kilowatt hour provided. Thus, consumers are charged for the length of time electricity flows through their electrical systems. They are not paying for individual products but for the privilege of using DP&L's service.

It is also important to note that an electrical charge released by an electric company at a power plant is sub-

stantially different in several respects from the charge that ultimately enters one's home. Section 402A(1)(b) of the Restatement requires that the product reach the consumer "without substantial change in the condition in which it is sold." This condition precedent clearly has not come into play under the undisputed facts of the case at bar. As an appellate court noted in *Rickert* v. *Dayton Power & Light Co.* (Dec. 20, 1984), Darke App. No. 1105, unreported, the electrical charge that flows through a power line may have a charge as high as 7,200 watts. The electrical charge is reduced substantially before it enters one's home. It is apparent that electric power cannot be considered a product intended to reach the consumer in the same condition in which it is released at a power plant. For this reason, and for the reasons stated above, we find electricity is a service, not a product, in the generally accepted sense of the word under the factual context of this case.

We must note that there are a scattering of cases that have determined electricity is a product for strict liability purposes.[2] Some have reached the

---

[2] The states of California, Colorado, Connecticut, Michigan, New Jersey, New York, and Wisconsin have drawn a distinction between electricity still in the distribution lines and electricity that has been sold as a product through the meter to the customer: *Pierce* v. *Pacific Gas & Elec. Co.* (1985), 166 Cal. App. 3d 68, 212 Cal. Rptr. 283; *Smith* v. *Home Light & Power Co.* (Colo. 1987), 734 P. 2d 1051; *Carbone* v. *Connecticut Light & Power Co.* (1984), 40 Conn. Supp. 120, 482 A. 2d 722; *Williams* v. *Detroit Edison Co.* (1975), 63 Mich. App. 559, 234 N.W. 2d˙702; *Aversa* v. *Public Serv. Elec. & Gas Co.* (1982), 186 N.J. Super. 130, 451 A. 2d 976; *Farina* v. *Niagara Mohawk Power Corp.* (1981), 81 App. Div. 2d 700, 438 N.Y. Supp. 2d 645; *Ransome* v. *Wisconsin Elec. Power Co.* (1979), 87 Wis. 2d 605, 275 N.W. 2d 641. Of

these states, Colorado, Michigan, and New York rejected the application of strict liability in tort because the electricity had not yet flowed through the meter. The states of California, Connecticut, New Jersey, and Wisconsin have applied strict liability in tort at a point near to or where electricity had flowed through the meter. Texas is the only state to hold a public utility strictly liable without making a distinction as to whether the electricity has passed through the meter. *Houston Lighting & Power Co.* v. *Reynolds* (Tex. App. 1986), 712 S.W. 2d 761. See, also, *Public Service Indiana, Inc.* v. *Nichols* (Ind. App. 1986), 494 N.E. 2d 349; *Schriner* v. *Pennsylvania Power & Light Co.* (1985), 348 Pa. Super. 177, 501 A. 2d 1128. Both *Schriner* and *Nichols* are stray-voltage cases. Both *Schriner* and *Nichols* hold that a public

curious conclusion that electricity passing through a consumer's meter becomes a product, but electricity not passing that point is a service. Although this distinction is convenient for Section 402A analysis purposes, we find it unsupported by both logic and common sense. The jurisdictions finding electricity to be a product with no meter distinction fail to recognize that electricity is not manufactured and that it undergoes a substantial change in form before entering the home. We decline the invitation to follow such logic.

Even if we applied the reasoning of the decisions that have adopted strict liability for public utilities, it must be stressed that a power company owes *no* duty to inspect or repair its customer's distribution system. *Naki* v. *Hawaiian Elec. Co.* (1968), 50

Hawaii 416, 442 P. 2d 55. The record before us indicates the stray voltage backed up onto the Ottes' wires. The fact that the Ottes' wires offered a low resistance path for the unused voltage to escape is hardly negligence on the part of DP&L. The only possible tort we can posit sounds in negligence on the theory that there was a failure to warn. As stated above, the jury rendered a verdict favorable to the Ottes on that charge.

## II

We have repeatedly held that a public utility is required to exercise the highest degree of care consistent with the practical operation of its business in the construction, maintenance, and inspection of its equipment and is responsible for any conduct falling short of that standard. *Hetrick* v. *Marion-*

---

utility can be strictly liable in tort under Section 402A of the Restatement of the Law 2d, Torts. These cases, however, do not address the issues in this case. In *Schriner,* the trial court denied the preliminary objections of the public utility to being subject to strict liability in tort. An interlocutory appeal was taken. The appellate court, although not the Pennsylvania Supreme Court, affirmed the trial court. There are, therefore, no facts in the record in *Schriner* with which to compare that case with this case. As an abstract matter, the court held that a public utility could be strictly liable in tort. There was no thorough discussion of the public policy ramifications of this holding. The court only briefly referred to public policy at the end of the opinion and never discussed the heavily regulated nature of a public utility.

*Nichols* also does not provide useful precedent. It held, like *Schriner,* that a public utility is subject to strict liability in tort. Nowhere in the opinion did the court of appeals discuss the public policy ramifications of this holding in connection with a heavily regulated public utility. Even though *Nichols* involved a jury verdict in

favor of the dairy farmer, it is factually distinguishable from this case.

In *Nichols,* the public utility was aware that Nichols intended to use electricity in his dairy operation and had indeed visited the Nichols farm to discuss his electrical needs with him while he was building his dairy barn. Within a year after he began milking cows, Nichols became aware of neutral-to-earth voltage coming from the public utility's primary neutral line. There is nothing in the decision about the levels of neutral-to-earth voltage or whether there were any defects in or anything wrong with the transmission and distribution lines of the public utility. The case simply does not offer the same facts as are present in this case.

For a more detailed analysis of the problems such as those encountered in *Nichols* and *Schriner,* see Comment, Shocks, Shorts and Sparks — Strict Liability for Electric Utilities? (1987), 20 Loyola L.A.L. Rev. 973; Comment, Torts of Electric Utilities: Can Strict Liability be Plugged In? (1978), 11 Loyola L.A.L. Rev. 775; Prosser, The Fall of the Citadel (1966), 50 Minn. L. Rev. 791.

*Reserve Power Co.* (1943), 141 Ohio St. 347, 25 O.O. 467, 48 N.E. 2d 103, paragraph two of the syllabus. We confirmed this proposition of law most recently in *Kohli* v. *Pub. Util. Comm.,* supra.

The *Kohli* case involved a neutral-to-earth voltage controversy. After finding that this distribution phenomenon was a normal and natural problem arising out of the utility's power load and grounding resistance, we held that the PUCO correctly ruled that the cost of an isolation transformer was properly the cost of the consumer insomuch as it was customer specific. We also noted that the PUCO was not the appropriate forum for a damage action keyed to this distribution problem. We found that a consumer could pursue his common-law remedies in a court of competent jurisdiction and further noted that the utility's standard of care in such a case is " 'the highest degree of care.' " *Kohli, supra,* at 15, 18 OBR at 12, 479 N.E. 2d at 842.

Overlooked by the court of appeals is our consistent posture, as expressed in *Hetrick, supra,* that the issue is whether or not the utility has exercised the highest degree of care in its business of delivering electricity to its sundry consumers. In such a case, the National Electric Safety Code ("NESC") controls the standards of a public utility in the installation, inspection and maintenance of its equipment which, of course, includes its transmission and distribution lines. The National Electric Code ("NEC") controls how the customer should install and maintain his own equipment and wiring.

As was stated in *Elgin Airport Inn, Inc.* v. *Commonwealth Edison Co.* (1982), 89 Ill. 2d 138, 143, 432 N.E. 2d 259, 261:
"* * * [A utility] cannot, either practically or legally, control the details of what appliances with what protective devices its customers are plugging in, or vary its rates accordingly; it can only insist on compliance with general standards like the national electric code, which will inevitably lag behind the state of the art."

A public utility does have the duty to advise its customers as to NEC standards. Compliance with the National Electric Safety Code was the key to the utility's success in *Hetrick* v. *Marion-Reserve Power Co., supra,* at 358, 25 O.O. at 472, 48 N.E. 2d at 108, which stated:

"The undisputed evidence is that this installation and maintenance were in conformity with and approved methods of the National Electric Safety Code; that this code is nationally known and nationally recognized by electrical engineers as authority in the erection and maintenance of equipment for transmission and distribution of electrical energy. Upon this record the only reasonable conclusion to be reached is that the power company was not guilty of negligence in the erection and maintenance of this line."

We have recognized, therefore, that delivery of electricity can be a very dangerous activity and hence have articulated a standard of care commensurate with that danger. Accordingly, we decline the invitation to overrule the above by adopting strict liability.

III

Economic, legal, and social policy ramifications have justified the imposition of strict liability in tort against manufacturers. The universal policy rationale for strict liability has been California Supreme Court Justice Roger J. Traynor's risk-allocation doc-

trine.[3] The shifting of the burden of proof in a products liability action is another important policy justification.[4] Strict liability in tort has also been viewed as an impetus for manufacturers to create safer products.[5]

We doubt whether the public policy considerations supporting the general imposition of strict liability are viable in an action against a highly regulated public utility. Generally speaking, the risk-allocation policy is applicable only when the industry affected may pass on its costs to the general public. A public utility in Ohio is highly regulated and price increases may only be established after administrative approval.[6] Likewise, shifting the burden of proof in a products liability action to relieve the plaintiff of the burden of proving fault lacks force when applied to a highly regulated public utility.[7]

---

[3] Historically, the buyer of a product was prohibited from suing a manufacturer of that product if the buyer did not stand in privity of contract with the manufacturer. See *Lonzrick* v. *Republic Steel Corp.* (1966), 6 Ohio St. 2d 227, 35 O.O. 2d 404, 218 N.E. 2d 185; see, generally, Prosser, The Assault upon the Citadel (1960), 69 Yale L.J. 1099, at 1099-1103; see, also, Prosser, The Fall of the Citadel, *supra*.

Courts engaged in a variety of legal fictions to avoid the privity barrier. Agency relationships, theoretical warranty assignments, and warranties based upon implied representations were judicially created. Indeed, *Lonzrick, supra,* adopted the "implied warranty in tort" doctrine to side-step the privity requirement.

In 1944, in the California Supreme Court case of *Escola* v. *Coca Cola Bottling Co. of Fresno* (1944), 24 Cal. 2d 453, 150 P. 2d 436, the doctrine of *res ipsa loquitur* was applied by the court in a negligence action against Coca Cola. In a now famous concurring opinion by Justice Roger J. Traynor, the rationale for strict liability was, for the first time, set forth:

"The cost of an injury and the loss of time or health may be an overwhelming misfortune to the person injured, and a needless one, for the risk of injury can be insured by the manufacturer and distributed among the public as a cost of doing business. It is to the public interest to discourage the marketing of products having defects that are a menace to the public. If such products nevertheless find their way into the market it is to the public interest to place the responsibility for whatever they may cause upon the manufacturer, who, even if he is not negligent in the manufacture of the product, is responsible for its reaching market. However intermittently such injuries may occur and however haphazardly they may strike, the risk of their occurrence is a constant risk and a general one. Against such a risk there should be a general and constant protection and the manufacturer is best situated to afford such protection." *Id.* at 462, 150 P. 2d at 441.

[4] See, generally, Calabresi, Some Thoughts on Risk Distribution and the Law of Torts (1961), 70 Yale L.J. 499.

[5] *Barker* v. *Lull Eng. Co.* (1978), 20 Cal. 3d 413, 435, 143 Cal. Rptr. 225, 239-240, 573 P. 2d 443, 457-458.

[6] Unlike a commercial manufacturer, a utility cannot with any degree of ease raise its prices to pass on to the consumer extraordinary costs. Thus, we doubt whether the economic policy considerations behind the risk-allocation doctrine compel application of strict liability to a highly regulated industry such as DP&L.

[7] We recognize that in many industries, the manufacturer is in the best position to identify whether a product is defective. A public utility, however, is not in the best position to determine when its distribution system could be harmful to a particularized industry. Neutral-to-earth voltage may be harmful to a dairy herd but may have no impact on other consumers. By making the utility strictly liable in this context, we would force the utility to study the possible effects of stray voltage or other phenomena arising out of distribution of electricity to each and every one of its customers.

Although application of strict liability provides a strong impetus for manufacturers to create safer products and is a cogent and meaningful justification, we must again point out that the public utility does not operate in a free market. Safety regulations are imposed upon it by the NESC. It is doubtful whether the imposition of strict liability would lead to a safer distribution system.

The various rationales set forth above lead us to conclude that strict liability in tort for damages caused by neutral-to-earth voltage is not a cause of action that may be asserted against a public utility.

IV

A final issue in this case is whether the jury interrogatories, as stated above, are inconsistent with the general verdict.

Civ. R. 49(B) provides in pertinent part:

"* *,* When one or more of the answers is inconsistent with the general verdict, judgment may be entered pursuant to Rule 58 in accordance with the answers, notwithstanding the general verdict, or the court may return the jury for further consideration of its answers and verdict or may order a new trial."

We previously ruled that judgment should not be rendered on answers to interrogatories as against the general verdict unless such answers are inconsistent and irreconcilable with the general verdict. *Becker* v. *BancOhio Natl. Bank* (1985), 17 Ohio St. 3d 158, 17 OBR 360, 478 N.E. 2d 776. The questioned jury interrogatories in this case are alleged to be inconsistent with the verdict.

The jury interrogatories, in our view, are vague and ambiguous. Six members of the jury answered "no" to the following special interrogatory: "Do you find by a preponderance of the evidence that any warning by the Dayton Power & Light Company to Plaintiffs about neutral-to-earth voltage and its effects on dairy cattle would have done any good?" This interrogatory has no time reference. It is possible the jury determined that defendant's negligence had injured the cattle and that warnings might have prevented further damage but not existing damage.

Eight members of the jury voted "yes" to the following interrogatory: "At the time Plaintiffs first complained about the effects of neutral-to-earth voltage on any of their dairy cattle, that is, in November of 1982, were such effects generally known within the dairy industry?" This interrogatory is vague. The jury could have determined that plaintiffs sustained the damages complained of before the effects of neutral-to-earth voltage were known in the industry.

Since we do not find the answers to be inconsistent or irreconcilable with the jury verdict, the appellate court was correct in its analysis of this issue. Thus, the decision of the trial court and the jury verdict, which were overturned on other grounds, must be reinstated.

Accordingly, the judgment of the court of appeals is reversed in part and affirmed in part.

*Judgment reversed in part and affirmed in part.*

MOYER, C.J., HOLMES, DOUGLAS and H. BROWN, JJ., concur.

LOCHER, J., concurs in part and dissents in part.

SWEENEY, J., dissents.

LOCHER, J., concurring in part and dissenting in part. I concur in Parts I and IV of today's decision. I also agree

with the syllabus. However, I cannot agree that a public utility necessarily meets the required "higher degree of care" test simply by following industry standards such as the National Electric Safety Code. The majority's position is inferred from my interpretation of Parts II and III of the majority opinion.

In *Kohli* v. *Pub. Util. Comm.* (1985), 18 Ohio St. 3d 12, 14-15, 18 OBR 10, 12, 479 N.E. 2d 840, 842, this court stated:

"Parenthetically, we would also remind the utilities that the range of their responsibilities to the public *is not limited solely by industry standards* and commission regulations. As Justice Oliver Wendell Holmes noted in *Texas & Pacific Ry. Co.* v. *Behymer* (1903), 189 U.S. 468, 470: 'What usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reason-able prudence, whether it usually is complied with or not.' With respect to a power company the standard is not merely reasonable prudence but is 'the highest degree of care.' *Hetrick* v. *Marion-Reserve Power Co.* (1943), 141 Ohio St. 347 [25 O.O. 467], paragraph two of the syllabus." (Emphasis added.)

While the majority opinion reinforces this court's adoption of the "highest degree of care" standard for power companies, it is my view that Part II and a portion of Part III of the opinion read in conjunction with *Kohli, supra,* send a mixed signal to the bench and bar of this state.

As a result, I concur separately and also reiterate the statement made in the last sentence of *Kohli,* urging utilities to "warn their consumers of the potential dangers of neutral-to-earth voltage." *Id.* at 15, 18 OBR at 12, 479 N.E. 2d at 843.