Plaintiff-Appellant Leo R. Smith, Jr., appeals the trial court's grants of summary judgments to Defendants-Appellees Ohio Edison, Inc., and Robert Morgan. Smith claims a genuine issue of material fact exists as to ownership of the external electrical wires which shocked him causing him to fall from a ladder and resulting in his permanent paraplegia, and that for that reason, summary judgment in favor of either Appellee was improper. We agree.
In March, 1995, Leo Smith, his wife Elizabeth, and their children moved into an old farmhouse on Blee Road in Springfield, Ohio, which they leased from the property owner, Robert Morgan. Smith agreed to pay $400 per month in rent, which was discounted to $350 per month to compensate for the fact that he would have to purchase bottled water to drink because the well on the property provided only unpotable water.
Shortly after moving to the property, Smith, who was a painter by trade, offered to remove the old, peeling paint from the exterior of the house and apply primer and fresh paint in exchange for a reduction in the rent. While there is some conflict between Smith and Morgan as to exactly how much the reduction in rent would be and for how long the rent would be reduced, the parties agree that a deal was struck, and Smith began the work in June of 1995.
Early in the afternoon, on June 25, 1995, Smith ascended a 30-foot extension ladder from which he intended to power wash old paint from the second-story soffit and fascia of the farmhouse. As he climbed the ladder with his equipment, he noticed three electrical wires running above a second story window and extending approximately fifteen feet from the corner of the house to a point where they were collected into a conduit leading to the electric meter below. In his casual glance at the wires, Smith noticed nothing extraordinary about them and he did not notice any bare copper wire showing through the deteriorated weatherproofing.[1]
Smith continued up the ladder until his feet were placed on a rung approximately one foot above the wires. Once there, he prepared to begin power washing the soffit and fascia. As he began the power washing, Smith was knocked from the ladder by an electrical shock caused by water from the power washer coming into contact with the bare copper wires where the weatherproofing had disintegrated. Smith landed on the wooden porch not far from where he had placed the ladder, nearly severing his spine. The only other person at the house at the time, Smith's young son, Leo, III, caught sight of his father in mid-fall, and ran to him. Smith directed his son to bring him the phone, which the child did, and Smith telephoned his brother who was not home, then dialed 9-1-1. Smith remembers being unable to talk, and handing the phone to little Leo, but can recall nothing more of the incident until he woke up in the hospital. He remained hospitalized until July 18, 1995, undergoing surgery three times during his stay. As a result of the accident, Smith is permanently paralyzed.
After the accident, Ohio Edison came to the Blee Road farmhouse and replaced the three wires with new triplex wire, which is three wires wrapped as one. Mrs. Smith states in her deposition that her son Jason, and Smith's father Leo, Sr., were at the farmhouse when Ohio Edison came to replace the old wires, and that they asked that the old wires be left on the premises or, at a minimum, preserved in anticipation of a lawsuit. Ohio Edison denies such requests were made, and in any case, the wires were taken to Ohio Edison's facility and later destroyed by way of recycling. It should be noted that the lease agreement between Smith and Morgan states the utilities are Smith's responsibility, making Smith, not Morgan, the utility's customer. Subsequently, and apparently in connection with Morgan's having the house equipped with 100 amp service, the wires were entirely encased in conduit and rerouted to run along the same side of the house, but below the second-story window rather than above it as before.
In October of 1996, Smith filed a complaint against Morgan, Mrs. Morgan, and Ohio Edison alleging (1) the Morgans had breached their statutory duty to maintain the electrical system resulting in Smith's injuries, (2) negligence on the part of Ohio Edison which proximately caused Smith's injuries, and (3) Mrs. Smith's loss of her husband's consortium as a result of his injuries. Smith later amended his complaint to include a spoilation of evidence claim against Ohio Edison. Mrs. Morgan was subsequently dismissed from the case.
Morgan and Ohio Edison both moved for summary judgment in the trial court and after a hearing, the trial court granted the motions. Smith brought a timely appeal advancing two assignments of error. Perhaps not surprisingly, he contends in his first assignment of error that genuine issues of material fact exist with regard to his claim against Ohio Edison, and makes the same assertion in his second assignment of error concerning to his claim against Morgan.
As we consider the merits of Smith's assigned errors, we are mindful that an appellate court reviews a trial court's grant of summary judgment de novo. Grafton v. Ohio Edison Co. (1996),77 Ohio St.3d 102, 105. Whether summary judgment is appropriate hinges upon the movant's demonstration (1) that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor. Harless v. Willis DayWarehousing Co. (1978), 54 Ohio St.2d 64, 66; Civ.R. 56(C). In addition, the burdens placed upon both the movant and nonmovant in a motion for summary judgment are as follows:
 [A] party seeking summary judgment, on the ground that the nonmoving party cannot prove its case, bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims. The moving party cannot discharge its initial burden under Civ.R. 56 simply by making a conclusory assertion that the nonmoving party has no evidence to prove its case. Rather, the moving party must be able to specifically point to some evidence of the type listed in Civ.R. 56(C) which affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claims. If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied. However, if the moving party has satisfied its initial burden, the nonmoving party then has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing that there is a genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party.
Dresher v. Burt (1996) 75 Ohio St.3d 280, 293. The court had previously held that "[a] motion for summary judgment forces the nonmoving party to produce evidence on any issue for which that party bears the burden of production." Wing v. AnchorMedia, Ltd. of Texas (1991), 59 Ohio St.3d 108, paragraph three of the syllabus. In Dresher, however, the court expressed a belief that its holding in Wing was too broad. Thus, afterDresher, a nonmovant is required to produce evidence only on those issues upon which the movant has sustained his or her initial burden as stated above. It is with these principles in mind that we approach the merits of Smith's two assignments of error.
 I. The trial court erred in sustaining the motion for summary judgment of Defendant Ohio Edison, Inc.
Smith first assigns as error the trial court's grant of summary judgment to Ohio Edison. He contends there is sufficient evidence in the record to raise a genuine issue of material fact as to whether Ohio Edison owned or was responsible for maintaining the old wires that ran along the outside of the Blee Road farmhouse. For the following reasons we agree.
Numerous evidentiary sources were referenced by Smith and Ohio Edison as tending to prove ownership of the old wires either was or was not vested in Ohio Edison. In particular, one or both of the parties point to Public Utilities Commission of Ohio ("PUCO") Reg. 10 § XI, the affidavit of Ronald Reed, Senior Claims Representative for Ohio Edison, the report of Smith's expert, Larry Dehus, the Ohio Supreme Court case ofOtte v. Dayton Power Light Co. (1988), 37 Ohio St.3d 33, the affidavit of professional engineer Samuel J. Sero, and the remedial measures taken by Ohio Edison after the accident as indications of Ohio Edison's ownership or nonownership of the old wires at the Blee Road farmhouse. For organizational ease, we discuss each item cited by Ohio Edison first, then analyze whether it met its burden under Dresher. Since we find it has, we go on to consider the evidence put forth by Smith, concluding that he has met his reciprocal burden to show the existence of a genuine issue of material fact. We conclude that summary judgment was erroneously granted to Ohio Edison.
A. Ohio Edison's Evidence That No Genuine Issueof Material Fact Exists For Trial 1. PUCO Reg. 10 § XI
In granting summary judgment to Ohio Edison, the trial court relied upon Public Utilities Commission of Ohio ("PUCO") Regulation No. 10 § XI as proof of Ohio Edison's lack of ownership of the wires spanning the distance between the point of first attachment with the residence and the electric meter. We find, however, that PUCO Reg. 10 § XI is, on its face, capable only of prospective application and because it is undisputed that the wires at the farmhouse were installed prior to the effective date of the regulation, the trial court improperly applied it retroactively.
The Ohio Supreme Court has observed that "[r]etroactive laws and retrospective application of laws have received the near universal distrust of civilizations." Van Fossen v. Babcock Wilcox Co. (1988), 36 Ohio St.3d 100, 104. That view is reflected in R.C. § 1.48, which states that "[a] statute is presumed to be prospective in its operation unless expressly made retrospective," and in Section 28, Article II of the Constitution of Ohio which denies the general assembly the power to pass retroactive laws. The prohibition against retroactive laws pertaining to legislative enactments also applies to rules and regulations promulgated by administrative agencies. See Murphy v. Ohio Dept. Of Highway Safety (1984),18 Ohio App.3d 99 (subjecting an agency's regulation to retroactivity analysis); Fraternal Order of Police v. Hunter
(1975), 49 Ohio App.2d 185 (finding rule promulgated by administrative agency subject to prohibitions against retroactive laws); and Ohio Assn. of Cty. Boards of MentalRetardation and Developmental Disabilities v. Public EmployeesRetirement Sys. (1990), 61 Ohio Misc.2d 836 (holding an administrative rule with retroactive application to be violative of due process). Determining whether a regulation may constitutionally be retroactively applied involves a two-part inquiry. Van Fossen, supra at 106. First, we look to whether there exists any expressed specification that the regulation have retroactive applicability. Id.; R.C. 1.48. If the answer is "yes," we go on to consider whether the regulation "takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past." Van Fossen, supra, citing Cincinnati v.Seasongood (1889), 46 Ohio St. 296, 303. Because we find no indication that PUCO Reg. 10 § XI was intended to have retroactive effect, however, we need not address the second inquiry.
PUCO Reg. 10 § XI provides as follows:
 A. Installation: The customer shall supply all wiring on the customer's side from the point of attachment as designated by the Company. All customer's wiring and electrical equipment should be installed so as to not only provide for immediate needs but for reasonable future requirements and shall be installed and maintained by the customer to at least meet the provisions of the National Electrical Code, the regulations of the governmental authorities having jurisdiction and the reasonable requirements of the Company. All new installations shall be inspected and approved by an electrical inspector of recognized standing before the Company connects its service. Changes in wiring on the customer's premises shall also be inspected and approved by such an electrical inspector.
 B. Company responsibility: The Company shall not be held responsible for any injury or damage which may result from defects in the customer's wiring or the use of electrical appliances or equipment on the customer's premises.
The language of the regulation is devoid of any express indication that it is to be applied retroactively. On the contrary, § XI(A) of the regulation, by its very terms, applies only to "installation" of wiring, an event incapable of retroactive regulation. In addition, the regulation imposes only future obligations on the customer by stating what the customer "shall" do in regard to installation of wiring. The word "shall" is characteristically and distinctively prospective in nature. See Merriam Webster's Collegiate Dictionary, Tenth Edition (1997) 1075-76. Consequently, PUCO Reg. 10 § XI(A) applies only to electrical wiring installed after the regulation's effective date, determined by the trial court to be December 17, 1985. Since there is no dispute that the wires at the farmhouse were installed long before that date, most probably 35-60 years prior to Smith's accident, and because Ohio Edison pointed to no evidentiary material tending to show it had not installed the wires originally, the question of ownership of the wires remains unanswered. Thus, PUCO Reg. 10 § XI(A) does not demonstrate the absence of a genuine issue of material fact on the essential element of ownership and responsibility for maintaining the old electrical wires which is an element of Smith's claim. To the extent that the trial court relied on the regulation to demonstrate ownership, therefore, it erred.
In addition, PUCO Reg. 10 § XI(B), relied upon by the trial court and claimed by Ohio Edison to relieve it of liability from injury or damage caused by the old wiring, does so only if the old wiring is owned by the customer. Thus, ownership must be determined before § XI(B) comes into operation. Since we conclude below that ownership of the wires is a genuine issue of material fact, it was premature for the trial court to exempt Ohio Edison from liability on the basis of PUCO Reg. 10 § XI(B).
 2. Affidavit of Ronald Reed, Senior Claims Representative for Ohio Edison
With its motion for summary judgment, Ohio Edison presented the affidavit of its Senior Claims Representative Ronald Reed in which he stated Ohio Edison's ownership and duty to maintain any wires ended at the point of first attachment to the customer's residence. Attached to his affidavit was a copy of PUCO Reg. 10 § XI, discussed above, which appears to be the basis for Reed's statements made in the affidavit. Aside from the impropriety of the regulation's retroactive application to the case at hand, we note several inadequacies with Reed's affidavit in regard to its use as evidence of Ohio Edison's non-ownership of the electrical wires at the Blee Road farmhouse.
For instance, the first sentence of § XI(A) states, "[t]he customer shall supply all wiring on the customer's side fromthe point of attachment as designated by the Company." (Emphasis added.) In his affidavit, Reed stated the wires from the utility pole to the point of first attachment with the residence were owned and maintained by Ohio Edison, and that the three wires running along the house past the point of first attachment were the property and responsibility of the customer. None of the evidence before us suggests, however, that Ohio Edison has ever designated the point of first
attachment as the "point of attachment" referred to in the regulation. Moreover, even if Reed's statement were to establish just that, there is no evidence demonstrating such designation was made prior to Smith's accident. Reed's affidavit really amounts to nothing more than his post-accident interpretation of PUCO Reg. 10 § XI, which we have determined to be inconclusive on the question of ownership of wires installed prior to the regulation's effective date. We conclude that inasmuch as PUCO Reg. 10 § XI does not settle ownership of the wires, Reed's interpretation of the regulation to the contrary falls short of doing so as well. Nevertheless, and in the event that Reed's affidavit was not exclusively reliant on his interpretation of the regulation, Reed's affidavit is some
evidence demonstrating ownership of the wires was vested in someone other than Ohio Edison.
3. Report of Smith's expert, Larry Dehus
In a report prepared after inspection of the Blee Road premises prior to replacement of the old wires, forensic scientist Larry Dehus, like Reed, stated that
 [T]he power company has the responsibility for the service drop wire which is the wire from the power pole to the first point of attachment on the house. The homeowner then has the responsibility of maintaining the service entrance conductor wires which run from the service drop attachment to the meter.
Dehus cites the National Electrical Code ("NEC") as the basis for his opinion. We have previously noted that the NEC controls how the customer should install and maintain its own equipment.Fortman v. Dayton Power Light (1992), 80 Ohio App.3d 525,530, citing Otte, infra at 39. Since installation and maintenance of service-entrance conductors, one of the industry terms for the old wires at the farmhouse, is contained within the NEC, Dehus' statement in his report is some evidence showing Ohio Edison was under no duty to maintain the wires that caused Smith's injuries.
4. The Otte case
Ohio Edison also cited Otte v. Dayton Power Light Co.
(1988), 37 Ohio St.3d 33, as support for its argument that it had no duty to maintain the electrical wires past the point of first contact at the farmhouse. In Otte, the Ohio Supreme Court stated that a "power company has no duty to inspect or repair its customer's distribution system." Id. at 38. We find Otte to be factually dissimilar to the case sub judice. There, the plaintiff claimed stray neutral-to-earth voltage, which is a byproduct of the transmission of electrical power, had prevented his dairy cows from giving milk resulting in infections and milk spoilage in the cows' udders. There was no dispute, however, that the Otte's lines were not under the care and control of the utility company. Otte at 34. Furthermore, the voltage involved did not escape the electrical lines until after it had passed through the Otte's meter. Id. at 37. Thus,Otte stands only for the proposition that electrical wiringbeyond a meter is within a customer's distribution system, and does not have any bearing on the circumstances before us in the instant case.
Here, the essential questions to be answered are, "Who owned the deteriorated wire?" and "Who was responsible for maintaining them?", which can also be restated for analysis under Otte as, "Were the wires within the customer's distribution system?" Otte simply provides no guidance for resolving such questions. Thus, that part of Otte upon which Ohio Edison relied in its motion can only support a summary judgment where no controversy exists as to the ownership of or responsibility to maintain electrical wires. Such is most definitely not the case here.
B. Whether Ohio Edison Has Met its Burden UnderDresher
Ohio Edison's basic argument in support of its motion for summary judgment was that it did not own the wires in question, nor did it have a duty to maintain the wires. As a movant is required to do, Ohio Edison informed us of the basis for its motion, and identified those portions of the record that demonstrate the absence of a genuine issue of material fact on the issues of ownership and duty to maintain the wires, which are essential elements of Smith's claim. We find that Ohio Edison met its initial burden by pointing to evidence, in particular Reed's affidavit and Dehus' report, which affirmatively demonstrates Ohio Edison was without ownership of the wires and had no duty to maintain them. We next turn to determine whether Smith satisfied his reciprocal burden to set forth specific facts showing a genuine issue exists concerning ownership and the duty to maintain the wires.
C. Smith's Evidence That a Genuine Issue ofMaterial Fact Exists for Trial 1. Affidavit of professional engineer Samuel J. Sero
In response to Ohio Edison's motion for summary judgment, Smith submitted the affidavit of professional engineer Samuel J. Sero. In it, Sero identified the deteriorated wiring on the farmhouse as being typical of that installed by power companies, including Ohio Edison, around the time electrical service was initially installed in the Blee Road farmhouse. We note again that Ohio Edison did not point to any evidence that would show they did not install the wiring, whether it was original or otherwise, at the farmhouse. According to Sero, that particular type of wiring was in use exclusively by power companies, who, at the time electricity was brought to the farmhouse in 1936, installed such wiring from the utility pole, through the meter, into the house, and in some cases, all the way to the fuse panel. Sero further states that in his experience, a power company's duty to maintain such wiring continued until the wiring was replaced.
2. Ohio Edison's subsequent remedial measures
Through the depositions of Mrs. Smith, Morgan, and Richard White, an Ohio Edison foreman, Smith set forth specific facts showing that Ohio Edison came to the Blee house about three weeks after the accident, replaced the wires between the point of first attachment and the meter, took possession of the old wires, and subsequently disposed of them. At the hearing on its motion for summary judgment Ohio Edison suggested it did so at the request of Morgan, and that as a consequence, the evidence relied on by Smith falls short of implicating Ohio Edison as the owner of the wires, and that therefore no genuine issue of material fact remains for trial. We note, however, that because Ohio Edison's claim that Morgan requested replacement of the wires was presented in argument, it is not the type of evidence that can support a motion for summary judgment under Rule 56(C). Furthermore, Ohio Edison's contention does not explain why, if it did not own the old wires, it would have refused its customer's request that they be left at the premises after their replacement. Similarly, it is apparent that Ohio Edison never billed either Smith or Morgan for replacement of the wires, which contradicts Ohio Edison's claim that it did so as a service to Morgan. In addition, Morgan testified in his deposition that he did not call Ohio Edison following Smith's accident until after he learned the company had replaced the old wires. Morgan Deposition at 40, 61-63. The fact that Ohio Edison employee Richard White's deposition has attached to it a copy of a service call report indicating Morgan called to report the dangerous wires to Ohio Edison before they were replaced complicates rather than resolves the question of ownership of the wires.
D. Whether Smith Has Met His Burden UnderDresher
Under Dresher, Smith is required to set forth specific facts on those issues with which Ohio Edison has sustained its initial burden, and in doing so must show that a genuine issue of material fact exists for trial. Since we are bound, in the summary judgment context, to view the evidence and all reasonable inferences therefrom in a light most favorable to the nonmovant, in this case Smith, we find Sero's affidavit raises a question of fact as to whether Ohio Edison installed the wires at the Blee Road farmhouse, and whether, as a result, they had an ongoing duty to maintain those wires. Further, we find Ohio Edison's post-accident replacement of the wires and its disposal of the old wires contrary to the wishes of its customer to be an exercise of dominion and control from which reasonable minds could infer that Ohio Edison owned or was responsible for the wires. Smith has, therefore, satisfied his burden under Dresher.
E. Conclusion
To summarize, we find the trial court erred in retroactively applying PUCO Reg. 10 § XI(A) to the facts in the case subjudice, and that neither § XI(B) of the regulation nor Otte
provide guidance with which to determine ownership of the wires at issue or any liability that flows therefrom. Even so, Ohio Edison has pointed to evidence, namely Reed's affidavit and Dehus' report, that demonstrates it did not possess ownership of the wires that caused Smith's injuries, nor did it owe Smith a duty to maintain the wires. Ohio Edison has thus satisfied its initial burden under Civ.R. 56.
In response, Smith has provided evidence to show Ohio Edison did indeed own or have a responsibility to maintain the old wires. Smith's evidence suggests Ohio Edison installed the type of wiring that caused Smith's injuries, that such wiring was used exclusively by utility companies at the time the Blee Road farmhouse was equipped with electricity, that utility companies, once having installed such wiring, remained responsible for its maintenance until the wires were replaced, and that after Smith's accident Ohio Edison's exercise of dominion and control over the wires overrode any right its customer may have had to the wires and was consistent with one possessing ownership of the wires. Viewing the evidence and all reasonable inferences therefrom in a light most favorable to Smith, we conclude that a genuine issue of material fact exists for trial, to wit, ownership and duty to maintain the old wires. The trial court's grant of summary judgment to Ohio Edison was, therefore, error.
Smith's first assignment of error is sustained.
 II. The trial court erred in sustaining the motion for summary judgment of Defendant Robert Morgan.
The trial court granted summary judgment to Morgan on grounds that Smith had conveyed to Morgan no notice of a defect on the premises as is required by Shroades v. Rental Homes, Inc.
(1981), 68 Ohio St.2d 20, and that Morgan had not retained possession and control of the farmhouse necessary for imposition of liability for the condition of the premises. In his second assignment of error, Smith contends the trial court erred by allowing Morgan's voluntary ignorance of the condition of the wires to insulate him from liability, and by finding the common law defense of a landlord out of possession and control available in a claim brought under R.C. § 5321.04. For the following reasons, we agree.
In his motion for summary judgment, Morgan essentially argued that he had no actual notice of the defective condition of the wires prior to Smith's accident, and that the Shroades case does not permit constructive notice to suffice in landlord/tenant suits brought under R.C. § 5321.04. He citedBurnworth v. Harper (1996), 109 Ohio App.3d 401, and Harris v.Tigner (1995), 108 Ohio App.3d 152 in support of his argument. We find both cases to be factually distinguishable from those presented in the instant case. Furthermore, on the authority of our recent decision styled Lansdale v. Dursch (Nov. 6, 1998), Montgomery App. No. 16858, unreported, we find that the notice requirement applicable to the facts before us dictates only that Morgan have notice that the wires were improperly maintained, and that the evidence in the record creates a genuine issue of material fact as to whether Morgan had such notice. The trial court's grant of summary judgment to Morgan was, therefore, erroneous.
Under Chapter 5321 of the Revised Code, "[a] landlord is liable for injuries, sustained on the demised residential premises, which are proximately caused by the landlord's failure to fulfill the duties imposed by R.C. 5321.04."Shroades, supra, syllabus. Among the duties so imposed are the following:
 (A) A landlord who is a party to a rental agreement shall do all of the following:
* * *
 (2) Make all repairs and do whatever is reasonably necessary to put and keep the premises in a fit and habitable condition;
* * *
 (4) Maintain in good and safe working order and condition all electrical, plumbing, sanitary, heating, ventilating, and air conditioning fixtures and appliances, and elevators, supplied or required to be supplied by [the landlord].
In Shroades, supra, the Ohio Supreme Court explained the statute as follows:
 R.C. 5321.04 imposes duties on the landlord to make repairs and do whatever is necessary to put and keep the premises in a fit and habitable condition. Furthermore, the purpose of the statute is to protect persons using rented residential premises from injuries. A violation of a statute which sets forth specific duties constitutes negligence per se. However, in addition to negligence per se, proximate cause for the injuries sustained must be established. Also it must be shown that the landlord received notice of the defective condition of the rental premises, that the landlord knew of the defect, or that the tenant had made reasonable, but unsuccessful, attempts to notify the landlord. (Cites omitted.)
Id. at 25-26.
Recently, we had occasion to consider the holding ofShroades in the context of a tenant's claim brought under R.C. § 5321.04(A)(4). Lansdale, supra. Lansdale involved a tenant who brought suit under R.C. § 5321.04(A)(4) alleging her landlord's failure to maintain a fuel oil furnace caused her to suffer injuries from carbon monoxide poisoning. We noted that:
 Most courts that have addressed the issue of notice in actions brought under subsection (A)(4) have applied the Shroades requirement that the landlord have notice of a defect even though the duties imposed by that subsection differ from the duty imposed under subsection (A)(2), under which Shroades was decided. (Cites omitted.) We believe, however, these cases conflate both the duties imposed by the two subsections and their respective notice requirements.
 Subsection (A)(2) imposes upon landlords the duty to make repairs so that the premises are kept in a fit and habitable condition. The language in Shroades establishing the requirement that the landlord have notice of a defect before liability may attach is nearly identical to that found in subsection (A)(2). Subsection (A)(4), however, places upon the landlord a duty to maintain certain fixtures and appliances he provides to his tenants in a good and safe working order and condition.
 The word "repair" is defined as "to restore by replacing a part or putting together what is torn or broken: fix." Merriam Webster's Collegiate Dictionary, Tenth Edition (1997) 991. "Maintain," on the other hand, means "to keep in an existing state (as of repair, efficiency, or validity): preserve from failure or decline." Id. at 702. A duty to repair and a duty to maintain, therefore, are not synonymous, as one requires the landlord to fix what is broken or defective, and the other requires him to take preventative action prior to the development of a defect. Consequently, when a tenant asserts a cause of action contending her landlord breached his duty to maintain any of the fixtures or appliances listed in subsection (A)(4), it is nonsensical to require the tenant to show her landlord had notice of some defect when the landlord is under a statutory duty to prevent just such a defect. We conclude that when a tenant claims her landlord breached his duty to repair under subsection (A)(2), she must show her landlord had notice of a defect pursuant to Shroades, but if the tenant's basis for her claim is that the landlord breached his duty to maintain one of the appliances listed in subsection (A)(4), the tenant need only show that the landlord had actual or constructive notice that the appliance was improperly maintained. Such a showing may be demonstrated by, inter alia, evidence regarding the procedures necessary to maintain the particular appliance; any inspection, testing, or lack of the same, of the appliance for defects; or the landlord's schedule for regular maintenance or lack thereof. * * * (Cite omitted.)
 [Requiring a tenant who claims her landlord breached his statutory duty to maintain to give the landlord notice of a defect] defies both logic and common sense. In addition, such a requirement would make it impossible to differentiate between the landlord's duty to repair and his duty to maintain, a result that would be at odds with the statute which itself distinguishes the duties.
Lansdale v. Dursch (Nov. 6, 1998), Montgomery App. No. 16858, unreported.
Here, Morgan, in his deposition, emphatically denied that he ever replaced, inspected, or paid any attention whatsoever to the wiring at the Blee Road farmhouse, and he argues that his resulting ignorance of the condition of the wires immunizes him from liability for failure to maintain the wires. Were we to accept Morgan's argument, it would inevitably lead us to a Catch-22-like conundrum: the landlord cannot be held liable for a tenant's injuries unless he had notice of the defect before the injury, but an unsuspecting tenant will not know and therefore could not give the landlord notice of the defect until he or she has suffered injury. While requiring Morgan to have notice of a defect makes logical sense in the context of his duty to repair, which obligates him to fix what is broken, it does not where the duty alleged to have been breached is that to maintain, which in contrast requires him to take reasonable care toward preventing defects from developing.
Nevertheless, Morgan cited Burnworth v. Harper (1996),109 Ohio App.3d 401 in support of his proposition before the trial court and again in this court. In Burnworth, suit was brought against a landlord on the basis that he failed to maintain a gas space heater which resulted in the carbon monoxide poisoning deaths of the tenants. As Morgan points out, and as is true here, the landlord admitted that he had never inspected the heating or ventilation systems and that he had no regular maintenance schedule for the heating units. In finding the landlord was not liable, however, the court in Burnworth noted the fact that the gas company had inspected the heating system in the apartment one year prior to the tenants' deaths, and that the only problem was with a faulty valve, which was immediately cured. Id. at 406. No evidence was presented to suggest that the defect which ultimately caused the tenants' death would have been discovered by a subsequent inspection by the landlord.
In contrast, here no inspections of the Blee Road farmhouse wiring had been conducted by anyone during the entire tenure of Morgan's ownership of the property, some twenty years by the time of Smith's accident, or at any other time in Morgan's memory. Morgan does not argue that the deterioration in the weatherproofing of the old wires would not have been discovered had they been inspected. Quite the contrary, he argues that the condition of the wires was so obvious that Smith himself knew or should have known of the danger they represented to him as he power washed the house, essentially a comparative negligence argument which, as a question for the trier of fact, is of no consequence to the matter before us, other than to indicate inspection would have detected the deterioration of the wires. Furthermore, an answer to the question of whether an inspection would have revealed that the weatherproofing had fallen away from sections of the wiring is at least suggested by the deposition of Ohio Edison foreman Richard White and Dehus' report in which both men state that bare wiring was visible and large sections of the weatherproofing had completely deteriorated. Dehus went on to state it was apparent that the wires had been deteriorated for a long period of time as was evidenced by the heavy oxidization he observed on the sections of bare copper wiring. Thus, the facts in the case before us differ in significant respects from those present inBurnworth.
Morgan also relied on a case wherein the court stated a landlord will only be held liable for a tenant's injuries where the landlord knew of the defect. Harris v. Tigner (1995),108 Ohio App.3d 152. That case involved lead paint, however, and a landlord has no statutory duty to maintain the surfaces of the walls in a rented house or apartment. See R.C. § 5321.04(A)(4) Instead, the only duty the landlord has in such a situation is the duty to repair, which we agree requires the landlord to have notice of a defect before liability can attach for a tenant's injuries. See R.C. § 5321.04(A)(2). Thus, bothBurnworth and Harris are inapposite to the facts in the instant case.
We find our holding in Lansdale, supra, applicable to the case before us. Because Morgan has failed to show that Smith can prove no set of facts to establish that Morgan breached his statutory duty to maintain the electrical system at the farmhouse as that duty is explained in Lansdale, he has not carried his initial burden. Even if he had done so, however, Smith has satisfied his reciprocal burden of showing that a genuine issue of material fact exists for trial by presenting evidence showing the type of weatherproofing originally in place on the wires was known to rapidly deteriorate, that Morgan never had the electrical system inspected, and that he had no regular maintenance schedule. In addition, supposingLansdale were not applicable, the evidence before us would still give rise to a factual question as to whether Morgan had constructive notice of the condition of the wires at the farmhouse. Contrary to Morgan's assertions before the trial court and in his brief to this court, and for the reasons expressed by Judge Grady in his Lansdale concurrence, constructive notice will suffice in a case brought under R.C. §5321.04(A)(2) or (4). See Burnworth, supra at 406; Blakley v.Riley (Jan 7, 1992), Franklin App. No. 91AP-597, unreported. Thus, summary judgment in favor of Morgan was improper insofar as it was premised on Morgan's lack of notice of a defect in the wiring.
Smith also argues under his second assignment of error that the trial court erred by finding Morgan was not liable for Smith's injuries as a matter of law because Morgan did not retain sufficient possession and control of the rented premises to subject him to liability. A defense premised on the landlord being out of possession and control of the leased property is a common law defense, however, and is not available to a landlord whose tenant has brought suit under R.C. §5321.04(A)(4). Shump v. First Continental-Robinwood Assoc.
(1994), 71 Ohio St.3d 414, 419, citing Stackhouse v. Close
(1911), 83 Ohio St. 339, paragraph one of the syllabus; seeShroades, supra at 25. In addition, the cases Morgan cites in support of his argument, Ogle v. Kelly (1993), 90 Ohio App.3d 392, and Hendrix v. Eighth and Walnut Corp. (1982), 1 Ohio St.3d 205, both involved third parties' claims against landlords and were therefore outside the statutory reach of R.C. § 5321.04. Also, the Hendrix case concerned a commercial lease to which the provisions of the statute do not apply.
Finally, Morgan claims the terms of the lease agreement shift possession and control of the premises to the renter and relieve Morgan of liability. The relevant clause in the agreement is as follows:
 Liability: Renter understands and agrees that the premises, appurtenances and fixtures will be under the control of Renter, his family, guests or invitees, and that Owner shall not be liable for any damage, whether to persons or property, caused by failure of any plumbing, heating, sewage, electrical, water and gas systems or supply, nor for roof leaks, nor for any damage arising from the elements.
The legislature, however, has prohibited rental agreement terms that are inconsistent with Chapter 5321. R.C. § 5321.06 reads in its entirety as follows:
 A landlord and tenant may include in a rental agreement any terms and conditions, including any term relating to rent, the duration of an agreement, and any other provisions governing the rights and obligations of the parties that are not inconsistent with or prohibited by Chapter 5321. Of the Revised Code or any other rule of law.
Moreover, R.C. § 5321.13 states, in relevant part, the following:
 (A) No provision of this Chapter may be modified or waived by any oral or written agreement except as provided in division (F) of this section.
* * *
 (D) No agreement by a tenant to the exculpation or limitation of any liability of the landlord arising under law or to indemnify the landlord for that liability or its related costs shall be recognized in any rental agreement or in any other agreement between a landlord and tenant.
* * *
 (F) The landlord may agree to assume responsibility for fulfilling any duty or obligation imposed on a tenant by section 5321.05 of the Revised Code * * *.
The provision in Morgan and Smith's lease agreement are consequently invalid as attempts to alter the statutory duties of the parties in a way prohibited by Chapter 5321, and Morgan retains his obligation to maintain the electrical system as well as any liability for failing to do so. See Allstate Ins.Co. v. Dorsey (1988), 46 Ohio App.3d 66.
In conclusion, we find that the trial court's grant of summary judgment in favor of Morgan was error. The notice requirement under R.C. § 5321.04(A)(4) requires that the landlord have notice, actual or constructive, that the electrical system on the premises has not been properly maintained. Because Morgan contends his neglect in maintaining the wires immunizes him from rather than subjects him to liability, we find he has not carried his initial burden of showing that Smith could prove no set of facts entitling him to relief on the issue of notice. Were we to find otherwise the result would be the same, however, because Smith has presented an abundance of evidence to suggest Morgan did know the electrical system had not been maintained for twenty or more years and that the deteriorated condition of the wires would have been detected by inspection. We also conclude that the trial court's finding that Morgan was not in possession and control of the premises and was therefore not liable as a matter of law to be erroneous. No such defense is available to landlords in actions brought under R.C. § 5321.04. Consequently, Smith's second assignment of error is sustained.
Having sustained both of Smith's assignments of error, the judgments of the trial court granting summary judgments in favor of Ohio Edison and Morgan are hereby reversed and remanded for further proceedings not inconsistent with this opinion.
WOLFF, J. and GRADY, J., concur.
Copies mailed to:
Ronald E. Schultz Robin R. Freeman Paul J. Winterhalter Hon. Gerald F. Lorig
[1] Nothing in the record suggests to this court what the difference between "insulation" and "weatherproofing" might be in the electrical context, but it is clear the terms are not interchangeable. The wires on the outside of the Blee Road farmhouse were consistently said to have had "weatherproofing" rather than "insulation." Thus, in deference to those more knowledgeable in the electrical trade than we, the protective coating around the wires in question will be referred to as "weatherproofing."